UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br><br>v.<br><br>ONE ORANGE 1969 CHEVROLET CAMARO<br>SS 396 WITH HAULMARK TRAILER; ONE<br>YELLOW 1969 CHEVROLET CAMARO RS SS;<br>ONE 2001 GMC SIERRA K2500 HD; and<br>$25,034.00 IN U.S. CURRENCY,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

04-10445PBS

MAGISTRATE JUDGE _____

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

The United States of America, by its attorney, Michael J.

Sullivan, United States Attorney for the District of

Massachusetts, in a civil action of forfeiture pursuant to Title

21, United States Code, Sections 881(a)(6) and (4), alleges that:

1.    This Court has jurisdiction in this matter pursuant to

28 U.S.C. §§ 1345, 1355, and 1356.  Venue is appropriate pursuant

to 28 U.S.C. § 1395.

2.    The in rem Defendant Properties are now, and, during

the pendency of this action, will be within the jurisdiction of

this Court.

3.    The Defendant Properties are identified as:

•    one orange 1969 Chevrolet Camaro SS 396 with Haulmark
     Trailer, bearing Vehicle Identification Number
     124679N527589, and Massachusetts Registration No.
     1382TX, seized from Victor Miller at 88 Lovells Lane,
     Marstons Mills, Massachusetts, on or about October 2,
     2003 (the "Camaro SS 396");

•    one yellow 1969 Chevrolet Camaro RS SS, bearing Vehicle
     Identification Number 124379N511901, and Massachusetts

Registration No. 1969YE, seized from Victor Miller at 88 Lovells Lane, Marstons Mills, Massachusetts, on or about October 2, 2003 (the "Camaro RS SS")

- one 2001 GMC Sierra K2500 HD, bearing Vehicle Identification Number 1GTHK23G01F167555, and Massachusetts Registration No. C187GM, seized from Victor Miller on or about October 1, 2003 (the "GMC Sierra"); and

- $25,034.00 in U.S. Currency, seized from Victor Miller on or about October 1, 2003,

(collectively referred to as the "Defendant Properties").

4.    As detailed in the Affidavit of United States Drug Enforcement Administration Cape Cod Task Force Agent Sean E. Balcom, attached hereto as Exhibit A, and incorporated herein by reference, the United States has probable cause to believe that the Defendant Properties represent moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of the Controlled Substances Act, Title 21, United States Code, Sections 801 et seq. (the "Controlled Substances Act"), proceeds traceable to such an exchange, and/or moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of the Act, and/or they were used or intended to be used to transport, or to facilitate the transportation, sale, receipt, possession or concealment of controlled substances, in violation the Controlled Substances Act.

5.    The Defendant Properties, therefore, are subject to

2

seizure and forfeiture to the United States of America, pursuant to 21 U.S.C. §§ 881(a)(6) and (4).

WHEREFORE, the United States of America prays:

1.    That a warrant and monition, in the form submitted herewith, be issued to the United States Marshal for the District of Massachusetts, commanding him to serve process upon the Defendant Properties, and to give notice to all interested parties to appear and show cause why the forfeiture should not be decreed;

2.    That judgment of forfeiture be decreed against the Defendant Properties;

3.    That thereafter, the Defendant Properties be disposed of according to law; and

4.    For costs and all other relief to which the United States may be entitled.

Respectfully submitted,
MICHAEL J. SULLIVAN
United States Attorney

By: _Shelbey D. Wright_
SHELBEY D. WRIGHT
Assistant U.S. Attorney
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3100

Dated:  3|4|04

3

## VERIFICATION

I, Sean E. Balcom, United States Drug Enforcement Administration Cape Cod Task Force Agent, state that I have read the foregoing Verified Complaint for Forfeiture In Rem and the Affidavit, attached as Exhibit A, and that the contents thereof are true to the best of my knowledge, information and belief.

_Sean E. Balcom_

Sean E. Balcom, Task Force Agent
United States Drug Enforcement
Administration

Dated: 3/3/04

COMMONWEALTH OF MASSACHUSETTS

Suffolk
~~Barnstable~~, ss.

Boston
~~Barnstable~~

Then personally appeared before me the above-named Sean E. Balcom, Cape Cod Task Force Agent, United States Drug Enforcement Administration, who acknowledged the foregoing to be true to the best of his knowledge, information and belief, on behalf of the United States of America.

Subscribed to and sworn to before me this 3rd day of March, 2004.

_Lisa J. Talbot_

Notary Public
My commission expires: 5/29/09

N:\LTalbot\wright\88 Lovells Lane\Complaint for Forfeiture1.wpd

LISA J. TALBOT
Notary Public
Commonwealth of Massachusetts
My Commission Expires
May 29, 2009

4

## EXHIBIT A

## AFFIDAVIT OF TASK FORCE AGENT SEAN E. BALCOM

I, Sean E. Balcom, being duly sworn, do hereby depose and
state that:

1.    I am a Detective Sergeant for the Barnstable Police
Department, currently assigned to the United States Drug
Enforcement Administration ("DEA") Cape Cod Task Force ("CCTF").
I have been a police officer for fifteen years.  I have been
involved in numerous investigations of violations of the
Controlled Substances Act.  Those investigations have resulted in
arrests and convictions for violations of the drug laws, seizures
of drugs, firearms, and real estate, and forfeiture of money,
vessels, and motor vehicles.

2.    I have attended the Massachusetts Criminal Justice
Training Council Police Academy, Barnstable, Massachusetts, where
I received basic narcotics training and graduated in May of 1989.
I have had supplemental training in the recognition and detection
of illegal narcotics and the apprehension of narcotics offenders.
I have attended specialized schools on street level narcotics
investigations, confidential informants, search warrants, drug
interdiction, criminal procedure, and narcotics task force
operations.  As a result of my training and experience, I am
familiar with the methods, routines, and practices of narcotics
traffickers.  I am also familiar with various items used to

1

compound, process, deliver and serve as containers for cocaine, heroin, and other controlled substances. I have testified in both Superior and District Courts in Barnstable County, as well as before the Barnstable Grand Jury. I have earned a Bachelor's degree in Administration of Justice from Roger Williams University, as well as a Master's degree in Criminal Justice from Anna Maria College.

3. This Affidavit does not contain every detail I and other law enforcement personnel have learned during the course of this investigation, but I set forth the following information as probable cause to believe that the following assets, identified as:

- one orange 1969 Chevrolet Camaro SS 396 with Haulmark Trailer, bearing Vehicle Identification Number 124679N527589, and Massachusetts Registration No. 1382TX, seized from Victor Miller at 88 Lovells Lane, Marstons Mills, Massachusetts, on or about October 2, 2003 (the "Camaro SS 396");

- one yellow 1969 Chevrolet Camaro RS SS, bearing Vehicle Identification Number 124379N511901, and Massachusetts Registration No. 1969YE, seized from Victor Miller at 88 Lovells Lane, Marstons Mills, Massachusetts, on or about October 2, 2003 (the "Camaro RS SS")

- one 2001 GMC Sierra K2500 HD, bearing Vehicle Identification Number 1GTHK23G01F167555, and Massachusetts Registration No. C187GM, seized from Victor Miller on or about October 1, 2003 (the "GMC Sierra"); and

- $25,034.00 in U.S. Currency, seized from Victor Miller on or about October 1, 2003,

(collectively referred to as the "Defendant Properties"), are

2

subject to forfeiture to the United States, as they represent moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of the Controlled Substances Act, Title 21, United States Code, Sections 801 et seq. (the "Controlled Substances Act"), proceeds traceable to such an exchange, and/or moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of the Act, and/or they were used or intended to be used to transport, or to facilitate the transportation, sale, receipt, possession or concealment of controlled substances, in violation the Controlled Substances Act, and therefore are subject to seizure and forfeiture to the United States pursuant to 21 U.S.C. §§ 881(a)(6) and (4).

    4.    The information contained in this Affidavit is based on my personal involvement in the investigation of the criminal activity described herein, as well as information provided to me by other members of law enforcement, my examination of records and documents, and my training and experience. This Affidavit does not discuss all of the evidence obtained during the investigation, but only that which I believe is necessary to establish probable cause to support the Complaint for Forfeiture in rem.

## THE INVESTIGATION

5.    Toward the end of the Summer of 2003, the Yarmouth, Massachusetts, Police Department were contacted by a Confidential Source of Information (hereinafter referred to as the "CS"), concerning the drug distribution activities of Miller at his residence, 88 Lovells Lane, Marstons Mills, Massachusetts (hereinafter referred to as the "Property" or "Miller's Residence").

6.    On or about September 27, 2003, the CS conducted a controlled purchase of marijuana from Miller at the Property. Prior to the purchase, Detective Charles E. Peterson of the Yarmouth Police Department ("Det. Peterson") and I met with the CS at a pre-arranged location.  Det. Peterson searched the CS and the CS's vehicle for money, contraband, and weapons, with negative results.  I then provided the CS with $60.00 in Officially Recorded Funds ("OAF").

7.    I then drove to the area of Miller's Residence and initiated surveillance, while Det. Peterson followed the CS directly to the Property. At approximately 10:56 a.m., I observed the CS park its vehicle and walk into the garage area of Miller's Residence.  I then observed the CS leave the area of the Property at approximately 11:06 a.m.  Det. Peterson and I then followed the CS directly to the original pre-arranged location where the CS turned over a plastic baggie containing marijuana.

4

The CS stated that it had purchased the baggie and its contents from Miller in exchange for $50.00 of the OAF.  The CS then returned the remaining $10.00 in OAF to me.

8.    Det. Peterson searched the CS and the CS's vehicle again for money, contraband, and weapons, again with negative results.  I then transported the plastic baggie containing the marijuana to the Barnstable Police Department and secured it in an evidence locker pending transport to the Massachusetts Food and Drug Lab for analysis.  I also conducted a field test on a portion of the contents of the plastic baggie, which tested positive for marijuana.

9.    On or about October 1, 2003, at approximately 10:30 p.m., I was contacted by Massachusetts State Police ("MSP") Trooper Shawn Walsh ("Tpr. Walsh"), concerning the arrests of three Cape Cod men, identified as Victor Miller, John Stevens ("Stevens"), and Joseph Mailliard ("Mailliard").  Tpr. Walsh advised me that cocaine and marijuana had been recovered during the arrests.  Attached hereto as Exhibit A-1 is a copy of Tpr. Walsh's MSP report detailing the specifics of the arrests.

10.   I advised Tpr. Walsh that the CCTF had an ongoing and active marijuana distribution investigation involving Miller, and I, along with CCTF Agent Brian Guiney ("TFA Guiney") traveled to the Bourne State Police Barracks to speak further with Tpr. Walsh and to interview the three arrested individuals.

5

11.   Concurrent with the arrests of Miller, Stevens, and Mailliard, the GMC Sierra and the $25,034.00 in United States Currency were seized from Miller and subsequently turned over to the DEA to begin forfeiture proceedings.

12.   At approximately 11:00 p.m., I and TFA Guiney arrived at the barracks and first interviewed Stevens.  I advised Stevens of his Miranda Rights, prior to any questioning, and once Stevens agreed that he understood his rights, he agreed to answer some questions.  Stevens is a 34 year-old male residing in Mashpee, Massachusetts, and works at Costa's Auto Body in East Falmouth, Massachusetts.  At the time of his arrest, Stevens was found with approximately a half ounce of cocaine stuffed down his pants, by Tpr. Walsh.  Stevens was questioned about his activities on the evening of October 1, 2003, as well as his knowledge of Miller's marijuana distribution business.  Stevens was able to converse naturally and answer thought provoking questions in a reasonable and logical manner, even though Stevens did state that he had smoked a little marijuana a short time before being arrested.

13.   Stevens stated that he was accompanying Miller and Mailliard to Carlisle, Pennsylvania, for a vacation.  Stevens indicated that Miller was traveling to Pennsylvania to vacation and to attend a swap meet, and to possibly purchase another vehicle.  Stevens said that Miller had asked Stevens to come along on the trip and had told Stevens that he (Miller) would pay

for everything (Stevens had only $12.00 with him at the time of his arrest). Stevens said that he went to Miller's Residence around 8:00 p.m. that evening, and when he arrived, Mailliard was already there. At around 9:00 p.m., the three men left in Miller's GMC Sierra pick-up truck to drive to Pennsylvania. Stevens said that Mailliard drove the GMC Sierra, and that when Stevens got into the GMC Sierra, he saw a bag of cocaine in the back seat of the truck, along with some luggage. Stevens wasn't sure whether the cocaine belonged to Miller or to Mailliard, but stated that they both were aware of the bag of cocaine in the GMC Sierra, as all three talked about it. Stevens also admitted that he was in possession of a small amount of cocaine (½ gram) at the time the three left Miller's Residence in the GMC Sierra. Stevens said that they all smoked a little marijuana shortly after leaving Miller's Residence. Stevens further stated that when the blue lights went on (police lights), both Miller and Mailliard told Stevens to hide the cocaine. Stevens admitted to secreting the bag of cocaine down his pants, and stated that the ½ gram that Stevens had brought was on the rear floor of the GMC Sierra.

14. Stevens went on to state that before they left, he saw Miller at the Property in possession of a large "wad" of cash. Stevens did not know where Miller had put the money in the GMC Sierra, but estimated that it was twenty to thirty thousand

dollars.  Stevens said that he has known Miller for several years
and that Miller sells marijuana, charging approximately fifty
dollars per 1/4 ounce and approximately two hundred dollars per
ounce of marijuana.  Stevens said that he has purchased marijuana
from Miller at least 50 times over the past couple of years, and
that most of the transactions took place at Miller's Residence.
Stevens said that the most marijuana he has ever seen at Miller's
Residence is approximately two pounds, which he said he had
observed at the Property within the past year.  Stevens went on
to state that there are always crowds of people at Miller's
Residence to buy and smoke marijuana.

    15.  At approximately 11:30 p.m., I and TFA Guiney
interviewed Miller.  I advised Miller of his Miranda Rights prior
to any questioning and Miller stated that he understood his
rights under Miranda and would answer questions.  Miller was
found with two bags of marijuana down his pants when arrested by
Tpr. Walsh.  Miller was able to converse naturally and answer
thought provoking questions in a reasonable and logical manner.
Miller is a 40 year-old male, employed as an auto body technician
at Hyannis Collision in Hyannis, Massachusetts.  Miller did not
admit to ingesting any marijuana or cocaine prior to his arrest.
Miller was questioned about his activities on the evening of
October 1, 2003, as well as his marijuana distribution business.

    16.  Miller stated that on the evening of October 1, 2003,
he left his Residence with Stevens and Mailliard at approximately

8

9:00 p.m., to travel to Pennsylvania.  Miller said that they were going to stay through the weekend and attend a swap meet in the Carlisle, Pennsylvania, area.  Miller said that he was going to pay for most of the expenses (food and lodging) for the trip. Miller was asked about how much money he had taken with him for the trip.  Miller initially stated that he had brought about a thousand dollars with him.  However, when pressed on the issue, Miller acknowledged that he brought an additional twenty-four thousand dollars ($24,000) with him to possibly buy a car at the swap meet in Pennsylvania.  Miller indicated that he had hidden the money under the carpet beneath the front passenger seat of the GMC Sierra.  Regarding the marijuana located down his pants, Miller admitted ownership of the marijuana, and stated that it was for his, Stevens' and Mailliard's personal use on their trip. Regarding the cocaine found in Stevens' possession, Miller admitted purchasing the cocaine on October 1, 2003.  Miller declined to identify from whom he bought the cocaine.  Miller said that the cocaine was "to party" with on the trip.  Miller admitted that he was going to provide both Mailliard and Stevens with some of the cocaine to use on the trip.  Miller was adamant that he was not a cocaine trafficker and stressed that the cocaine was for the three men's personal use.

17.  Miller was questioned extensively about the approximately twenty-four thousand dollars ($24,000), (later determined to be $25,034.00 in U.S. Currency), located in the GMC

9

Sierra.   Miller referred to the money as his "savings".   Miller said that the money was not "drug money" and that it was earned and saved from his job at Hyannis Collision and from side work on cars that he does at his house.   I asked Miller what institution/bank that the money was drawn from.   Miller indicated that the money came from three different locations, as follows: approximately twelve thousand dollars ($12,000) was buried in his yard at the Property; approximately six thousand dollars ($6,000) was retrieved from a jacket pocket in his bedroom closet; and approximately six thousand dollars ($6,000) was retrieved from his toolbox at work.   I asked why Miller maintained his so called "savings" in such unorthodox locations, and not in a bank. Miller's response was, "just for kicks."   I asked Miller whether he had any bank accounts.   Miller said that he did have a bank account, which has approximately twenty-five thousand dollars ($25,000) in it, at the Cape Cod 5 Bank.   Miller also stated that the money in the Cape Cod 5 Bank was not "drug money."

18.   Miller was questioned about other known assets that he had acquired, specifically, the GMC Sierra pick-up truck, the Camaro SS 396, the Camaro RS SS, and Miller's Residence.   Miller stated that he bought the GMC Sierra pick-up truck approximately 2½ to 3 years ago, and paid around twenty-five thousand dollars ($25,000) for it.   Miller said that he put down ninety-five hundred dollars ($9,500) in cash, and got fifteen thousand dollars ($15,000) for a trade-in when the GMC Sierra was

10

purchased. Miller said that he took a three year loan, which was almost paid off, at four hundred thirteen dollars ($413) per month. Miller said that he used more "savings" for the ninety five hundred dollars ($9,500) he put down.

19. When discussing the Property, Miller said that he bought the Property approximately 10 years ago. Miller stated that his mortgage is approximately nine hundred dollars ($900) per month, and that he has less than nine years left to pay on the mortgage of the Property. Miller admitted to putting an addition on the Property, as well as remodeling the Property. Miller also claimed to be doing most of the work himself, or with friends. Miller also stated that he has rented rooms out of the Property for additional income, and indicated that he currently has one tenant at the Property. Miller then said that he did not own any other property.

20. As for other assets, Miller said that he currently owns two 1969 Chevrolet Camaros. Miller said that the two Camaros are worth at least seventy-five thousand dollars ($75,000). Miller declined to say how much he paid for the cars, but did say that the orange Camaro SS 396 cost him "more than fifty thousand dollars ($50,000)." Miller would not say how much more, but did indicate that he had paid cash. Regarding the yellow Camaro RS SS, Miller said that he just took a five hundred dollar ($500) deposit for the car, and that the selling price was approximately twenty-five thousand dollars ($25,000). Miller had not yet

11

received the money for this transaction.  Miller admitted to paying cash for the yellow Camaro RS SS also, although he did not say how much.

21.  I asked Miller how much money he makes working at Hyannis Collision.  Miller estimated that he takes home approximately six hundred dollars ($600) per week.  Miller said that he has been working at Hyannis Collision for approximately 19 years.  Miller said that he makes some additional money working on various vehicles in his garage.  Miller said that he has no official record of his additional income and could not say how much he makes per month or year.

22.  I then questioned Miller about marijuana distribution. Miller admitted to selling "small amounts" of marijuana over the past decade.  Miller clarified this by stating that he estimates that he sells marijuana to approximately 6 different customers, which he describes as "friends."  Miller thought that he conducted approximately ten marijuana sales per week.  I advised Miller that various intelligence and CCTF surveillance of Miller's Residence indicated that Miller did much more business than he is now estimating.  Miller then said that he may do a little more than he originally estimated.  I advised Miller that he cannot legitimately explain his large amounts of cash and his ownership of the Defendant Properties referenced previously.  I explained that even with his current take home income of approximately six hundred dollars ($600) per week, his renting a

12

room to a tenant in the Property, and his doing side work on cars in his garage, it simply does not add up to the amount of assets and cash that Miller currently has. I told Miller that between the purchase of the two Camaros and Miller's GMC Sierra pick-up truck, Miller has acknowledged spending approximately sixty thousand dollars ($60,000) in cash. Furthermore, he has admitted to having approximately twenty-five thousand dollars ($25,000) in his bank account. Finally, I mentioned the approximately twenty-four thousand dollars ($24,000) found in his GMC Sierra pick-up truck. I pointed out to Miller that these three alone total approximately one hundred nine thousand dollars ($109,000) cash. Miller then conceded that he makes "a little profit" selling marijuana from the Property. Miller then said that in addition to selling marijuana, he has traded marijuana to associates/contractors that have done work remodeling his house. Furthermore, Miller went on to state that he also smokes approximately one ounce of marijuana per week.

23. I then asked Miller to explain his involvement in the growing of marijuana. Miller said that he has grown marijuana both inside and outside of the Property. Miller said that he used to have a fairly sophisticated marijuana grow in the basement of the Property, but that he no longer grows marijuana inside the Property, even though he still has the special room in his basement that was used to grow the marijuana. Miller also said that he no longer has the equipment used to cultivate

13

marijuana, although he admitted that there were still some high
intensity lights and power sources in the Property.  Miller
stated that there were a few ounces of marijuana drying out
(indicating home grown) in his bedroom at the Property, and
approximately one and a half pounds of marijuana in a black
duffle bag hidden in a storage trailer beside his garage at the
Property.  Miller said that the one and a half pounds of
marijuana was being kept in his basement, but that he had moved
it to the trailer before he left for Pennsylvania.  Miller stated
that all of the marijuana in the Property was his, and that
Miller's roommate was not involved in the sale or cultivation of
marijuana.

    24.  I questioned Miller about his sources for the marijuana
he does not grow.  Miller was reluctant to provide a lot of
details about his source of supply.  Miller identified the
individual as "Joey" from the Plymouth, Massachusetts, area.
Miller said that he does not know Joe's last name, or his phone
number.  Miller said that Joe contacts him every week or so, and
arranges to resupply Miller with marijuana.  Miller said that Joe
drops the marijuana off at Miller's Residence.  Miller said that
he pays approximately fifteen hundred dollars per pound of
marijuana to Joe.  Miller said that he picks up approximately two
pounds at a time from the source of supply, and that this occurs
every week or so.  I asked Miller when was the last time he
bought marijuana from Joe.  Miller said that it was about a week

14

ago, and that he had purchased only one pound. Miller informed me that Miller charges fifty dollars ($50) per quarter ounce, and two hundred dollars ($200) per ounce, of marijuana. I advised Miller that that would mean that a typical two pound (32 ounce) purchase from "Joe" would cost Miller approximately three thousand dollars ($3,000). Miller agreed. I then advised Miller, that according to his own statement about how much marijuana he purchases, Miller is admitting to distributing approximately 31 ounces of marijuana (1 ounce subtracted for Miller's admitted weekly personal use), every week or so. I advised that that would mean that Miller was grossing approximately six thousand two hundred dollars ($6,200) every week, and netting approximately three thousand two hundred dollars ($3,200) per week or approximately one hundred sixty-six thousand, four hundred dollars ($166,400) per year. I asked Miller if that was what he meant when he stated that he made "a little profit" from selling marijuana. Miller said that there is no way that he makes that much money, because he doesn't just sell the marijuana, he trades it to friends and associates to work on his house.

25. At approximately 1:15 a.m. on October 2, 2003, I and TFA Guiney interviewed Mailliard. I advised Mailliard of his Miranda Rights prior to any questioning, and Mailliard stated that he understood his rights under Miranda and would answer questions. Mailliard was also able to converse naturally and

answer thought provoking questions in a reasonable and logical manner. Mailliard said that he is an auto body technician on Nantucket, but that his permanent residence is in Tennessee. Mailliard gave the same story as Miller and Stevens regarding the reason for the trip to Pennsylvania. Mailliard stated that he had smoked a small amount of marijuana in the GMC Sierra just prior to getting pulled over by Tpr. Walsh. When arrested by Tpr. Walsh, Mailliard was found with a metal pipe containing marijuana, and a knife. Mailliard was questioned regarding his knowledge of Miller's marijuana trafficking, as well as the money found in the GMC Sierra. Mailliard said that the money was Miller's, and that he saw Miller take the money from Miller's Residence before the three men left for Pennsylvania, and then hide the money under the carpet of the GMC Sierra. Mailliard said that Miller was looking to buy another car in Pennsylvania. Regarding the marijuana in the GMC Sierra, Mailliard said that the marijuana found on his person was his. Mailliard further stated that he knew that Miller had taken some marijuana from the Property to bring to Pennsylvania. Mailliard said that he has known Miller for several years and actually used to live with Miller, approximately 3½ years ago, at Miller's Residence. As far as Miller's marijuana trafficking, Mailliard said that Miller had been selling marijuana for as long as Malliard had known Miller. Mailliard described Miller's business as casual marijuana distribution. Mailliard clarified that statement by

16

stating that Miller sold to about 20 different customers each weekend.  Mailliard did not recall Miller selling marijuana during the week.  Mailliard said that as far as he knew, Miller only sold small quantities of marijuana, which he described as under a pound.  Mailliard said that at the time Mailliard was living with Miller, Mailliard routinely observed quantities of marijuana, up to one pound, at Miller's Residence.  Mailliard said that he did not know how much marijuana Miller had been selling recently, as Mailliard spends most of his time on Nantucket.  Mailliard claimed to have no knowledge about the cocaine found on Stevens.

26.  As a result of the arrests of Miller, Stevens and Mailliard, as well as the interviews and information obtained during the ongoing CCTF marijuana distribution investigation of Miller, I and Detective Charles Peterson ("Det. Peterson") met at the CCTF office and prepared an affidavit for a search warrant of Miller's Residence.  The affidavit was completed at approximately 4:15 a.m. on October 2, 2003, and at approximately 4:30 a.m., members of the CCTF and the Barnstable Police Department went to the Property to secure Miller's Residence.  This action was taken as a precaution against the removal and/or destruction of evidence, as I had been advised by Tpr. Walsh that Miller may be making his phone call from the MSP barracks in Bourne and was free to phone whomever he chose.  (Pursuant to the interview, Miller was aware that a search warrant was going to be obtained

17

for the Property, and Miller actually offered consent to search the Property.)  During the interview, Miller advised that there were two people, Miller's girlfriend, and Miller's roommate, staying at the Property.

27.  At approximately 4:45 a.m., I knocked on the door of Miller's Residence to determine if anyone was present.  A short time later, a woman by the name of Christine Estey ("Estey") answered the door.  I explained the situation to Estey (determined to be Miller's girlfriend).  Members of the CCTF and the Barnstable Police Department entered Miller's Residence and secured the Property until the search warrant was issued. Miller's roommate, Joe St. Thomas ("St. Thomas"), was located in his upstairs bedroom.  Both St. Thomas and Estey were advised of the situation and told that they were free to leave, if they desired.  St. Thomas and his son did leave a short time later, as St. Thomas' son had school to attend that same morning.  Estey chose to stay at the Property.

28.  Prior to his leaving the Property, I spoke with St. Thomas in private.  I asked St. Thomas if he would mind answering some questions.  I advised St. Thomas that he was not a part of the marijuana distribution investigation, and did not have to answer my questions.  St. Thomas was also told that Miller had already admitted to sole ownership of all of the marijuana in the Property.  St. Thomas agreed to answer questions.  St. Thomas is a 46 year-old male, employed at Joyce Landscaping in Barnstable,

18

Massachusetts.  St. Thomas advised me that he had been renting a room from Miller since June, 2003, and that he pays $600.00 per month to Miller.  St. Thomas was asked what he knows, if anything, about Miller's marijuana distribution business.  He stated that he was well aware that Miller sold marijuana, although he did not think he sold anything "big."  In St. Thomas' opinion, he felt Miller sold small quantities, described as an ounce and less, to a very large number of people.  St. Thomas advised that there is a "ton of foot traffic" in and out of Miller's Residence.  According to St. Thomas, Miller conducts most of his transactions in the basement of the Property.  St. Thomas said that he has witnessed numerous hand-to-hand sales between Miller and various customers.  St. Thomas said that these observations were usually when he was doing laundry in the basement.  St. Thomas said that he knows that Miller routinely trades marijuana to people (contractors) in exchange for work to be done on the Property.  St. Thomas also advised that Miller has marijuana plants growing out behind the shed in the back yard of the Property.

29.  At approximately 6:15 a.m. on October 2, 2003, the search warrant was authorized by Barnstable County Clerk of Courts William Eldridge.  At approximately 6:30 a.m., Det. Peterson arrived at Miller's Residence with the search warrant, and the following drugs and drug related paraphernalia were recovered: 1) numerous marijuana branches/buds, found hanging in

19

Miller's bedroom; 2) numerous marijuana stems and leaves found in a "Glad" plastic container on top of a desk in Miller's bedroom; 3) a "Hefty" plastic bag of marijuana branches/buds found in bottom dresser drawer in Miller's bedroom; 4) 2 "Hefty" plastic bags of marijuana, found in a black duffle bag located in a storage trailer beside the garage at the Property; 5) 2 marijuana plants, found growing in the back yard of the Property, behind a shed; 6) a prescription bottle containing numerous white tablets, inscribed "54/593" (in the name of Stephen Polsonetti), found in a dresser drawer in Miller's bedroom; 7) 6 marijuana gardening and/or cultivation books found in a dresser drawer in Miller's bedroom; 8) a package of gardening grow cubes and six fiber grow pots found on the floor in Miller's bedroom; 9) a surveillance system consisting of a recorder, monitor, and camera (pointed at the marijuana grow), found in a shed in the back yard of the Property; and, 10) a blue plastic bag containing grow paraphernalia (light bulbs, fertilizer, and power sources), found in the basement near the hidden grow room. A Copy of the search warrant, affidavit, and return are attached as Exhibit A-2.

30.   In conjunction with the search of Miller's Residence, agents seized the orange Camaro SS 396 with Haulmark Trailer and the yellow Camaro RS SS from the Property, as there is probable cause to believe that they represent property purchased with the proceeds of Miller's illegal marijuana distribution activities.

31.   Miller has been charged in Plymouth County District

Court with the following offenses:  Possession of Marijuana with Intent to Distribute; Possession of Class D and E Substances; Trafficking Cocaine; and Conspiracy to Violate M.G.L. c. 94C. Miller has also been charged in Barnstable County District Court with Possession of Marijuana with Intent to Distribute.  Stevens has been charged in Plymouth County District Court with the following offenses:  Trafficking Cocaine (14-28 grams); Possession of a Class B Substance; and Conspiracy to Violate Violate M.G.L. c. 94C.  Mailliard has been charged in Plymouth County District Court with Possession of Marijuana.

32.  Based on information obtained in this investigation, the United States filed a Verified Complaint for Forfeiture in Rem, and corresponding Affidavit, with the District Court on or about December 3, 2003 (*United States v. 88 Lovells Lane, Marstons Mills, Massachusetts*, Civil Action No. 03-12438-PBS). This Court issued a Warrant and Monition on or about December 8, 2003, finding that there is probable cause to believe that Miller's Residence constitutes real property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of a violation of 21 U.S.C. §§ 841, 846, and/or 856, and that the Property is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(7).

33.  In addition to the civil forfeiture action against Miller's Residence, DEA began administrative forfeiture proceedings against the Defendant Properties listed previously.

21

However, on or about December 23, 2003, DEA received a timely claim to the Defendant Properties from Miller, and based on statutory guidelines, the forfeiture of the Defendant Properties has now been referred to the United States Attorney's Office for judicial forfeiture proceedings.

34.   Therefore, based on information contained in this Affidavit, I have probable cause to believe that the following assets, identified as:

- one orange 1969 Chevrolet Camaro SS 396 with Haulmark Trailer, bearing Vehicle Identification Number 124679N527589, and Massachusetts Registration No. 1382TX, seized from Victor Miller at 88 Lovells Lane, Marstons Mills, Massachusetts, on or about October 2, 2003 (the "Camaro SS 396");

- one yellow 1969 Chevrolet Camaro RS SS, bearing Vehicle Identification Number 124379N511901, and Massachusetts Registration No. 1969YE, seized from Victor Miller at 88 Lovells Lane, Marstons Mills, Massachusetts, on or about October 2, 2003 (the "Camaro RS SS")

- one 2001 GMC Sierra K2500 HD, bearing Vehicle Identification Number 1GTHK23G01F167555, and Massachusetts Registration No. C187GM, seized from Victor Miller on or about October 1, 2003 (the "GMC Sierra"); and

- $25,034.00 in U.S. Currency, seized from Victor Miller on or about October 1, 2003,

(collectively referred to as the "Defendant Properties"), are subject to forfeiture to the United States, as they represent moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of the Controlled Substances Act, Title 21, United

22

States Code, Sections 801 et seq. (the "Controlled Substances Act"), proceeds traceable to such an exchange, and/or moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of the Act, and/or they were used or intended to be used to transport, or to facilitate the transportation, sale, receipt, possession or concealment of controlled substances, in violation the Controlled Substances Act, and therefore are subject to seizure and forfeiture to the United States pursuant to 21 U.S.C. §§ 881(a)(6) and (4).

Signed under pains and penalties of perjury this ___3rd___ day of ~~February~~ *March*, 2004.

Task Force Agent Sean E. Balcom
Cape Cod Task Force
United States Drug Enforcement
Administration

23